UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                          PLAINTIFF

v.                                                                         CASE NO. 3:20-CR-86-BJB
                                                                              *Electronically filed*

KEITH HUNTER                                                                      DEFENDANT

### RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

The defendant has moved the Court for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. DN 80 (Motion to Set Aside Verdict). While the defendant has not made a motion for new trial pursuant to Federal Rule of Criminal Procedure Rule 33, the defendant argues there were legal errors during the trial that affected the verdict. As such, the United States will address the defendant's motion under the standard for a motion for new trial, as well. The defendant cannot meet the high standard for a judgment of acquittal or a new trial. As such, the defendant's motion should be denied.

### FACTUAL BACKGROUND

Since the mid-1990's, the defendant failed to file timely tax returns and failed to pay tax that was due, even when he had the funds available to make the payments. Based on information the Internal Revenue Service obtained from the defendant's filed tax returns, the defendant had outstanding tax liability for 2000, 2001, 2002, 2006, 2008, and 2011. The defendant never made voluntary payments on these outstanding balances or otherwise paid them off.

In 2011, the defendant, a practicing lawyer, received approximately $1.4 million in payment for legal services that would have been more than sufficient to pay off all his outstanding

1

tax debt. Between 2013 and 2019, the defendant received over $250,000 in distributions from Hunter Hills LLC, a real estate development company in which he had a 50% interest. Rather than using these funds to pay off his tax debt, the defendant took steps to hide his assets so they could not be seized by the Internal Revenue Service.

The defendant purchased his home through a nominee and had a friend open a nominee bank account. In 2011, the defendant made a $300,000 donation to Through the Valley Foundation, Inc., his friend Wayne Gallavin's non-profit. Funds from the donation were then used by Through the Valley Foundation, Inc. to purchase the defendant's former home out of foreclosure. The defendant then lived in the home from 2012 up until he was arrested in this matter. In 2014, the defendant endorsed a check from a distribution from Hunter Hills LLC, and provided it to his friend, Wayne Gallavin. Wayne Gallavin opened a bank account at River City Bank under Wayne Gallavin's business, but designated the account as the defendant's account. The account was then used primarily for the benefit of the defendant.

The use of nominees to hold assets makes it more difficult for the Internal Revenue Service to identify and seize assets as part of the civil collection process. As the Internal Revenue Service made efforts to collect on the defendant's outstanding liability through civil processes, the defendant intentionally provided false and misleading information on multiple occasions during these proceedings.

The defendant also stored personal funds in an account identified as an attorney escrow account. An attorney escrow account is a bank account that is opened and maintained by an attorney, and which is dedicated solely to money received from and intended for clients. The

Internal Revenue Service would generally not seize funds in an attorney escrow account to pay off an attorney's tax debt, under the assumption the funds belong to the attorney's clients.

In January 7, 2011, the same day the defendant received over $1 million in legal fees, the defendant opened an account at PNC Bank that was labeled, "ATTY AT LAW, ESCROW ACCOUNT." *See* Trial Ex. 19H (PNC Bank records) at 1688. After opening the attorney escrow account, the defendant used the account to store his personal assets and pay for his personal expenses. *See id*. at 1252-1687. Shortly after opening the account, the defendant deposited $1,100,000 of a $1,288,895.66 payment for legal services into the escrow account. *See* Trial Ex. 19B (PNC Bank records) at 7-8; 19E (PNC Bank records). In August 2011, the defendant processed a $112,236.56 payment for legal services through the escrow account. *See* Trial Ex. 19A (PNC Bank Records) at 12; 19F (PNC Bank Records) at 54. In January 2017, the defendant deposited $140,000 from a distribution from Hunter Hills LLC into the escrow account. *See* Trial Ex. 19H at 822-23, 1587-91; Trial Ex. 26 (Hunter Hills records) at 8-9. In December 2016 and January 2017, the defendant also used the escrow account to deposit portions of three other checks from Hunter Hills LLC, in the amount of $7,500 each, into the escrow account. *See* Trial Ex. 19H at 761-63, 777-79, 794-796, 1576-86.

From January 2011 until at least 2019, the defendant also engaged in a process of operating in cashier's checks known as recycling cashier's checks. The defendant purchased a cashier's check, then later cashed out a small portion of the initial cashier's check, while using the remainder to purchase additional cashier's checks. By keeping assets in cashier's checks, rather than in a bank account, the defendant made it more difficult for the Internal Revenue Service to locate and seize the funds. For example, on March 2, 2017, the defendant used funds from the $140,000

distribution from Hunter Hills LLC to purchase one cashier's check for $30,000 and one cashier's check for $100,000. *See* Trial Ex. 19J (PNC Bank records) at 2-6; Ex. 19H at 1587-96. On March 13, 2017, the defendant used the $30,000 cashier's check to purchase a $24,000 cashier's check. *See* Trial Ex. 19J at 7-11. On September 5, 2017, the defendant used the $100,000 cashier's check to purchase a $50,000 cashier's check and a $42,500 cashier's check. *See* Trial Ex. 19J at 12-17. From February 13, 2018, to February 13, 2019, the defendant repeated this cycle, purchasing smaller cashier's checks using larger cashier's checks every two to three weeks. *See* Trial Ex. 29A (PNC Bank records) at 3-140.

## PROCEDURAL BACKGROUND

On September 16, 2020, a federal grand jury returned an indictment charging the defendant with one count of evasion of payment of tax, in violation of Title 18, United States Code, Section 7201. DN 1 (Indictment). The indictment alleged the defendant hid assets by "storing personal income in a client escrow account," using a "nominee bank account," "purchasing his home through a nominee," "recycling cashier's checks," and "providing false and misleading information regarding his assets and income" to the Internal Revenue Service. DN 1 at 1-2. On September 22, 2021, a federal grand jury returned a superseding indictment, charging the defendant with the same crime, but clarifying that bonds were also used in the pattern of recycling cashier's checks. DN 27 (Superseding Indictment). The defendant filed a motion for a bill of particulars, requesting specifics regarding how United States alleged the defendant had concealed assets. DN 16 (Motion for Bill of Particulars). The United States filed a bill of particulars, then amended it twice based on newly-acquired information. DN 19 (Bill of Particulars), 34 (Amended Bill of Particulars), and 36 (Second Amended Bill of Particulars).

Prior to trial, the United States provided notice regarding its intent to introduce evidence concerning: (1) the defendant's other false statements in Internal Revenue Service civil filings that had not been specified in the bill of particulars; (2) the fact that the only other property "owned" by Through the Valley Foundation, Inc., was "donated" by the stepmother of the defendant; (3) the defendant's unpaid tax deficiencies for 1996, 1997, 1998, and 1999, which were paid off over the defendant's objection through an interpleader action in 2018; and (4) the defendant's general tax return filing history during the charged period. DN 38 (United States' Pretrial Memorandum) at 10-13. While the United States takes the position all this evidence is relevant proof of willfulness related to the charged offense, the United States provided notice of its intent to use the evidence in case it was construed as Rule 404(b) evidence. The defendant filed a motion to exclude Rule 404(b) evidence. DN 64 (Motion to Exclude 404(b)). The Court denied this motion without prejudice to the defendant, thus permitting the defendant to raise specific objections during trial. DN 66 (Text Order).

The defendant also filed a motion to exclude evidence of evasive acts that occurred prior to the statute of limitations period. DN 57 (Motion to Exclude). The Court denied this motion without prejudice. DN 66.

Over the course of three and a half days, the United States introduced testimony from thirteen witnesses and moved thousands of pages of documents into the record. The jury instructions included this instruction regarding the statute of limitations:

> In order to find the Defendant guilty of tax evasion, the government must prove beyond a reasonable doubt that, on or after September 16, 2014, the Defendant committed an affirmative act constituting an attempt to evade or defeat the payment of a tax that was still collectible by the Internal Revenue Service at the time of the affirmative act. Although the government alleges the Defendant committed five types of affirmative acts of evasion listed above, it alleges that only two occurred

5

  on or after September 16, 2014: (1) storing personal assets in a client escrow account and (2) recycling cashier's checks and bonds. To find the Defendant guilty, you must agree that he committed either or both of these acts on or after September 16, 2014.

DN 75 (Jury Instructions) at 5-6. The Court read this instruction to the jury twice, and both defense counsel and undersigned counsel spent time emphasizing the requirements of the statute of limitations to the jury in closing. After approximately two hours of deliberation, the jury returned a verdict of guilty on the sole count of tax evasion.

## ARGUMENT

**I. The defendant's motion should be denied because there was more than sufficient evidence to sustain the conviction for tax evasion.**

  Under Rule 29 of the Federal Rules of Criminal Procedure, the defendant may move for a "judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant seeking acquittal under Rule 29 bears a "very heavy" burden. *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005). That is because the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "The government must be given the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial." *Id*. (citations omitted). The district court "does not judge the credibility of witnesses or weigh evidence." *Ostrander*, 411 F.3d at 691; *see also United States v. Underwood*, 11 Fed. Appx. 581, 585 (6th Cir. June 8, 2001). Accordingly, a defendant requesting an order of acquittal pursuant to Rule 29 must demonstrate that the evidence offered at

trial, viewed in the manner most favorable to the prosecution, was insufficient to convince a rational jury to find guilt beyond a reasonable doubt.

The elements of a violation of Title 26, United States Code, Section 7201 are (1) the existence of a tax deficiency, (2) an affirmative act of evasion of the tax, and (3) willfulness. *United States v. Heath*, 525 F.3d 451, 456 (6th Cir. 2008) (*citing United States v. DeNiro*, 392 F.2d 753, 758 (6th Cir. 1968) (citations omitted)). Further, the United States is required to prove "at least one affirmative act in furtherance of the evasion of payment of taxes" within the statute of limitations. *United States v. Threadgill*, 572 Fed. Appx. 372, 380 (6th Cir. 2002). The statute of limitations for violations of Section 7201 is six years. 26 U.S.C. § 6531(2). Here, where the indictment was returned on September 16, 2020, that means the United States was required to prove an affirmative act occurred after September 16, 2014.

**A. There was more than sufficient evidence to prove a tax deficiency.**

The evidence presented by the United States at trial regarding the defendant's tax liability for tax years 2000, 2001, 2002, 2006, 2008, and 2011, was largely uncontested. The United States introduced the defendant's tax preparer's copies of the defendant's filed tax returns for tax years 2000, 2001, 2002, 2006, 2008, and 2011. *See* Trial Ex. 3E (2000 Tax Return), 3F (2001 Tax Return), 3G (2002 Tax Return), 3K (2006 Tax Return), 3M (2008 Tax Return), and 3P (2011 Tax Return). Edwin Osborne, the defendant's tax preparer, testified that the returns were prepared based on information provided by the defendant. DN 70 (Trial Tr. – Test. of Edwin Osborne) at 3:12-16; 4:17-21. The defendant's own tax returns showed an outstanding tax liability for 2000, 2001, 2002, 2008, and 2011. *See* Trial Ex. 3E, 3F, 3G, 3K, and 3P. The defendant's filed tax return for 2011 acknowledged tax due and owing in the amount of $399,805

7

just for that tax year 2011.  *See* Trial Ex. 3P at 3.  The United States also introduced certified Internal Revenue Service accounts transcripts for tax years 2000, 2001, 2002, 2006, 2008, and 2011.  *See* Trial Ex. 6E (2000 Account Transcript), 6F (2001 Account Transcript), 6G (2002 Account Transcript), 6K (2006 Account Transcript), 6M (2008 Account Transcript), and 6P (2011 Account Transcript).   The account transcripts, which include numbers from the defendant's filed returns, provided evidence of what the defendant's outstanding tax liability was each year and whether any payments had been made on any liability.  The amount of tax due listed on the account transcripts for 2000, 2001, 2002, and 2008 was the same as or less than the amount shown on the defendant's filed returns.  *Compare* Trial Ex. 3E, 3F, 3G, and 3M to 6E, 6F, 6G, and 6M. The amount due and owing listed on the account transcripts for tax years 2006 and 2011 was higher than the amount listed in the defendant's filed tax returns, as the defendant was audited during those tax years and some of his deductions were not allowed.  *See* Trial Ex. 6K and 6P.  When viewed in the light most favorable to the government, the evidence from the defendant's tax filings and the Internal Revenue Service account transcripts was more than sufficient to prove the defendant had a tax deficiency for tax years 2000, 2001, 2002, 2006, 2008, and 2011.

### B. There was more than sufficient evidence to prove an affirmative act of evasion that occurred after September 16, 2014.

The United States provided evidence of five different affirmative acts, or methods the defendant used to hide his assets, two of which continued after September 16, 2014.  The United States offered evidence that the defendant continued to deposit personal income from Hunter Hills LLC into an account that was labeled to appear as a client escrow account until at least February 2017.  The United States also offered evidence that the defendant continued to recycle cashier's checks until at least February 2019.

With respect to the attorney escrow account, the United States introduced testimony and documents related to the two bank accounts the defendant had at PNC. The United States introduced a signature card for defendant's PNC account ending in 8190, which showed the account was labeled, "Keith Hunter, Attorney at Law," and had been open since at least 2000. *See* Trial Ex. 19I (PNC Bank records) at 72. PNC Bank records showed on January 7, 2011, the defendant received a $1.2 million payment for legal services in the 8190 account. *See* Trial Ex. 19B at 7-10. PNC Bank records showed on the same day, the defendant opened a new account ending in 0147 that was labeled "Keith Hunter, Attorney at Law, Escrow Account." *See* Trial Ex. 19H at 1688.

Multiple witnesses testified that an attorney escrow account is a client escrow account for holding funds received from or intended for clients. Elisabeth Ridenour, a former PNC Bank employee, testified that an "attorney escrow account is a deposit account that is used to hold clients' funds." DN 82 (Trial Tr. – Test. of Elisabeth Ridenour) at 6:23-25. Janice Theriot, an attorney, testified she worked at a law firm with the defendant from around 2000 until around 2013. DN 81 (Trial Tr. – Test. of Janice Theriot) 3:2-6. During her testimony, Janice Theriot explained the law firm had two separate accounts -- an operating account and an escrow account. *Id.* at 10:18-11:19. Theriot explained the law firm escrow account held funds that came in from or for clients. *Id.* Theriot explained the portion of the client funds that belonged to the firm had to be transferred to the operating account before it could be spent. *Id.* Christopher Giesin, a former revenue officer at the Internal Revenue Service, testified that an "attorney's escrow account" is an "account that's set up . . . for the client's money." DN 83 (Trial Tr. – Test. of Christopher Giesin) at 29:14-16. Giesin further testified that because the 0147 account was

9

labeled as "Attorney at Law, Escrow Account," the Internal Revenue Service could not levy the account, under the assumption it held client funds. *Id*. at 29:21-30:7, 105:2-10.

While the 0147 account was labeled to appear as if it held client funds, it was actually used for the defendant's personal income and personal expenses. Account records showed the defendant deposited both legal fees and proceeds from Hunter Hills LLC into the account. Bank records showed from December 2016 through January 2017, the defendant deposited funds from four different Hunter Hills LLC checks in to the 0147 account. *See* Trial Ex. 19H at 761-63, 777-79, 794-796, 822-23, 1576-91. The defendant further used the account to pay for vacations, meals, and to purchase a car with a friend. *See* Exhibit 19H. The defendant argues that since the account was not actually used as a client escrow account, the jury could not have reasonably concluded he stored personal income in a client escrow account. DN 80 at 1-2. However, when viewed in the light most favorable to the government, particularly given the defendant's past dealings with the Internal Revenue Service and his training and practice as an attorney, the evidence from the defendant's PNC Bank account records and the testimony of multiple witnesses was more than sufficient to prove the defendant stored personal income in an account he labeled "Attorney at Law, Escrow Account," so the funds would be safe from seizure as the bank and the Internal Revenue Service would assume the account was a client escrow account containing client funds.

With respect to the process of recycling cashier's checks, the United States introduced testimony and bank records, including copies of cashier's checks. Records showed on January 7, 2011, the defendant turned his $1.2 million payment into a $1.1 million cashier's check and a $155,000 cashier's check, both payable to himself. *See* Trial Ex. 19C (PNC Bank records) at 5-

9. Records showed just a few days later, the defendant use the $155,000 cashier's check to purchase four more cashier's checks, including one payable to himself in the amount of $83,750. *See id.* at 8-11; 19D (PNC Bank records) at 9. Records showed less than two weeks after that, the defendant cashed in the $83,750 cashier's check and purchased two cashier's checks, including one payable to himself in the amount of $64,450. *See* Trial Ex. 19C at 10, 18-21; 19D at 11. The evidence introduced at trial showed the defendant continued to recycle cashier's checks throughout the indictment period, including after September 16, 2014. In March 2017, the defendant purchased one cashier's check for $30,000 and one cashier's check for $100,000. *See* Trial Ex. 19J at 2-6; Ex. 19H at 1587-96. Records showed that less than two weeks later, the defendant used the $30,000 cashier's check to purchase a $24,000 cashier's check. *See* Trial Ex. 19J at 7-11. Records further showed six months later, in September 2017, the defendant used the $100,000 cashier's check to purchase a $50,000 cashier's check and a $42,500 cashier's check. *See* Trial Ex. 19J at 12-17. Elisabeth Ridenour testified that through her job at PNC Bank, she was responsible for looking through the defendant's bank records to determine if there was any unusual activity. In her work, Ridenour looked at the defendant's banking activity between February 2018 and February 2019. During that period, in looking at the defendant's banking activity, she determined "there [were] a lot of cashier's checks being purchased and recycled," which involved "purchasing a cashier's check, cashing the check later on, receiving some cash back, and then purchasing an additional cashier's check and repeating this process." *See* DN 82 at 11:9-16. The United States introduced copies of all the cashier's checks the defendant purchased through PNC Bank from February 13, 2018, through February 13, 2019, which showed

the pattern of repeatedly cashing in a cashier's check and using it to obtain funds and purchase a small cashier's check.   *See* Trial Ex. 29A at 3-140.

### C. There was more than sufficient evidence to prove the defendant acted willfully.

The United States introduced records and testimony proving the defendant acted willfully – that he was aware of his unpaid tax debt and took steps to prevent the Internal Revenue Service from collecting.   The United States introduced evidence that numerous notices were sent to the defendant regarding his outstanding text debt.   *See* Trial Ex. 6A-6G, 6K, 6M, and 6P.   Janice Theriot, the defendant's former colleague and friend, testified that she had conversations with the defendant about his tax liens in the 2010 to 2011 period, that Theriot had asked the defendant about paying off the liens, and that the defendant provided various excuses, including saying "he didn't agree with the wars in the Middle East."   DN 81 at 17:2-22.   Edwin Osborne, the defendant's tax preparer, testified the defendant asked Osborne what the statute of limitations was for the Internal Revenue Service's ability to collect on taxes.   DN 71 at 35:21-36:13.   From this, the jury could infer the defendant was seeking information on how long he would need delay payment for his tax debt became uncollectible.

The United States offered several examples of instances where the defendant took evasive steps in response to an action by the Internal Revenue Service.   Edwin Osborne testified the defendant received notice that he was being audited towards the end of 2010.   DN 71 at 12:1-14. At the beginning of January 2011, as described above, the defendant opened the attorney escrow account and began recycling over $1 million in legal fees into cashier's checks.   The United States introduced records showing in late June 2013, the Internal Revenue Service issued a summons on Zielke Law Firm that requested information related to how Zielke Law Firm paid the

12

defendant. *See* Trial Ex. 15A (Interpleader motion) at 18-19. The defendant testified Zielke Law Firm notified the defendant when it received the summons. DN 84 (Trial Tr. of Keith Hunter) at 86:17-22. The United States introduced bank records that showed in June 2013, the account ending in 0147 had an average balance of $52,437.07. *See* Trial Ex. 19H at 1370. Bank records showed that by the end of July 2013, after Zielke Law Firm informed the defendant of the Internal Revenue Service summons, the balance for the 0147 account was under $5,000. *Id*. at 1377. Bank records further showed the balance for the 0147 continued to be extremely low or negative into 2014. *Id*. at 1383-1441. The United States also introduced bank records that showed in January 2014, the defendant used approximately $60,000 in proceeds from Hunter Hills LLC to open up a bank account in Wayne Gallavin's business's name, which was then used by the defendant. *See* Trial Ex. 39B (River City Bank records). From this, the jury could infer that once the defendant became aware of the Internal Revenue Service's collection attempts through the Zielke summons, he moved funds out of the 0147 account to ensure it would not be seized by the Internal Revenue Service and sought to keep his money in an account in someone else's name. Janice Theriot also testified that after the Zielke Law Firm was ordered to pay the defendant as part of a lawsuit, the firm notified the Internal Revenue Service that it would be making a payment to the defendant, and there was an interpleader action in which the Internal Revenue Service sought to obtain the money from the judgment to pay off portions of the defendant's existing tax debt. DN 81 at 24:20-25:20. The United States also introduced evidence, including both Theriot's testimony and court filings, showing that the defendant opposed the judgment being used to pay off his tax debt. *Id*. at 25:24-26:9; Trial Ex. 15B (Interpleader response). Further, the United States introduced evidence that the defendant canceled his homeowner's insurance policy on his

home, which he ostensibly had no ownership interest in, shortly after Special Agents of the Internal Revenue Service executed a search warrant was executed on the home.  *See* DN 84 at 24:5-11; Trial Ex. 30A (Kentucky Farm Bureau records) at 344.

This evidence was more than sufficient to support the jury finding beyond a reasonable doubt that the defendant acted willfully.  However, the United States introduced even more evidence regarding willfulness that is set out in Section II.A below.

## II.     The defendant's motion should be denied because there was no substantial legal error that occurred that would justify a new trial.

Under Rule 33 of the Federal Rule of Criminal Procedure, the defendant may move the court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim P. 33.  Rule 33's "interest of justice" standard permits the granting of a new trial where it is shown that "substantial legal error" has occurred during the trial.  *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (*citing United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)). In such circumstances, "any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting new trial."  *Wall*, 389 F.3d at 474 (citation omitted).

### A.     The Court correctly denied the defendant's motion to exclude Rule 404(b) evidence.

The defendant argues that Rule 404(b) evidence was improperly admitted.  The section of the defendant's motion for a judgment of acquittal regarding Rule 404(b) evidence, much like the defendant's motion to exclude Rule 404(b) evidence, does not specify what evidence he is referring to.  Nonetheless, the defendant cannot show substantial legal error occurred with relation to Rule 404(b) evidence, as all of the evidence identified by the United States as potential

Rule 404(b) evidence in its pretrial memorandum is direct evidence relating to this defendant's willfulness, and thus is intrinsic to or inextricably intertwined with the charged offense.

In *United States v. Barnes*, the Sixth Circuit explained the distinction between acts that are "intrinsic" to the charged offenses, and therefore not subject to Rule 404(b), and those that are "extrinsic" "other acts" and subject to Rule 404(b). 49 F.3d 1144, 1149 (6th Cir. 1995). "Where the challenged evidence is 'intrinsic' to, or 'inextricably intertwined' with evidence of, the crime charged, Rule 404(b) is not applicable." *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011) (citation omitted). "Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense . . . ." *Marrero*, 651 F.3d 471. The Sixth Circuit has also held that "a continuing pattern of illegal activity" is not an "other act" subject to Rule 404(b). *Barnes*, 49 F.3d at 1149.

The categories of evidence listed in the United States' pretrial memorandum all qualify as intrinsic evidence of the defendant's willfulness. The first category of evidence is the defendant's other false statements in Internal Revenue Service civil filings. Proof the defendant lied to the Internal Revenue Service during the civil collections process is evidence the defendant was not acting in good faith with the collections process and was trying to hide assets. The second category is evidence the only other property "owned" by Through the Valley Foundation, Inc. was "donated" by the stepmother of the defendant. This tends to show that Through the Valley Foundation, Inc. was not a legitimate charity, and that the defendant's "donation" to the charity was part of a "continuing pattern" of hiding assets. The third category is evidence the defendant had unpaid tax deficiencies for 1996, 1997, 1998, and 1999, which were only paid as part of an

interpleader action. "A defendant's prior taxpaying history is competent evidence to establish 'willfulness.'" *United States v. Grumka*, 728 F.2d 794, 797 (6th Cir. 1984). The defendant filed his tax returns for tax years 1996, 1997, 1998, and 1999 in 2006, the same day he filed his returns for 2000, 2001, and 2002. *See* Trial Ex. 6A-6G. The defendant never made a voluntary payment on the tax due for 1996, 1997, 1998, and 1999, and as such, received numerous notices regarding his unpaid taxes for those years contemporaneous with notices with respect to tax years 2000, 2001, and 2002. *See* Trial Ex. 6A-6D. In 2018, the Internal Revenue Service finally obtained payment for the taxes due for 1996, 1997, 1998, and 1999 through an interpleader action over the defendant's objection. *See* Trial Ex. 6A-6C, 15A, 15B. The fact that the defendant received notices for taxes due relating to 1996 through 1999 during the same period he was receiving notices for the taxes due relating to 2000 through 2002 proves the defendant was aware he had outstanding debt the Internal Revenue Service was attempting to collect on. The fact that he objected to the Internal Revenue Service collecting money due through an interpleader suit tends to show the defendant wanted to prevent the Internal Revenue service from collecting his tax liability. The fourth and final category was evidence of the defendant's general tax return filing history during the charged period. Edwin Osborne, the defendant's tax preparer, testified the defendant generally did not file on time. DN 70 at 10:19-24. Osborne further testified the defendant would file returns for a number of years at one time, generally as a result of an outside factor like an Internal Revenue Service audit or bankruptcy proceedings. *Id.* at 11:2-12:14. This evidence tends to show the defendant did not voluntarily comply with tax-related obligations without outside pressure, which tends to show willfulness.

Here, the evidence the defendant challenged was direct evidence relating to his willfulness and thus is intrinsic evidence, which is not subject to Rule 404(b). But even if the evidence were not intrinsic to and inextricably intertwined with the crime charged – which it is – the evidence was admissible under Rule 404(b).

A district court must make three findings before admitting evidence under Rule 404(b). *United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2006). It must first find that the prior bad act occurred. *Id*. The government must provide sufficient evidence of the prior bad act so that "the jury can reasonably conclude that the act occurred and that the defendant was the actor." Here, the defendant does not seem to contest whether any of the other acts occurred, and there was testimonial and documentary evidence supporting each category of evidence. Next, the district court must determine that the evidence is probative of one of the permissible Rule 404(b) purposes. *Id.*, 516 F.3d at 440. As explained above, the evidence at issue tends to prove willfulness, which is related to two categories specifically identified in Rule 404(b): knowledge and intent. Finally, the district court must determine that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to the defendant. Fed. R. Evid. 403; *Bell*, 516 F.3d at 440. "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 Committee Notes. Here, none of the four categories of evidence were likely to evoke an emotional response or otherwise to cause the jury to make a decision on an improper basis. The fact that the evidence the United States introduced was damaging to the defendant and prejudicial to his case is not enough to satisfy the standard of "unfair prejudice." As such, the probative value of the evidence at issue was not outweighed by the danger of unfair prejudice.

17

The categories of evidence were properly admitted either as intrinsic evidence or as Rule 404(b) evidence. As such, no substantial legal error occurred in their admission that would justify a new trial.

**B.** **The Court correctly denied defendant's motion to exclude evidence predating the statute of limitations.**

The defendant argues that the Court should have excluded evidence of affirmative acts that predate the statute of limitations cutoff of September 16, 2014. The defendant cannot show substantial legal error occurred with respect to affirmative acts that occurred prior to the statute of limitations period, as the Court appropriately followed Sixth Circuit precedent in admitting the older affirmative acts and instructing the jury a guilty verdict required that it unanimously find at least one affirmative act after September 16, 2014.

The statute of limitations is a "procedural rule that requires the bringing of a complaint within a certain time after the completion of a crime," not a "rule that restricts the introduction of evidence." *United States v. Carlson*, 235 F.3d 466, 470 (9th Cir. 2000) (internal citations omitted). District courts in the Sixth Circuit have found that where an offense involves ongoing criminal conduct, there is not a requirement that all acts have occurred within the statute of limitations period. *See United States v. Dimora*, 843 F.Supp.2d 799, 850 (N.D. Ohio Jan. 4, 2012) ("It is not necessary to prove the entire conspiracy was committed within the statute of limitations period."); *United States v. Braunm*, No. 3:18-CR-30-TAV-DCP, 2018 WL 4560356, at *3 (E.D. Tenn. Aug. 20, 2018) (finding that defendant's conduct outside of the statute of limitations period was legally relevant and admissible in wire fraud case). In cases where a defendant is charged with violating 26 U.S.C. § 7201 and acts of evasions occur both inside and outside the state of limitations, the Sixth Circuit has held district courts acted appropriately where jury instructions

provide "at least one affirmative act in furtherance of the evasion of payment of taxes" within the statute of limitations. *United States v. Threadgill*, 572 Fed. Appx. 372, 380 (6th Cir. 2002); *see also United States v. Hook*, 781 F.2d 1166, 1171–72 (6th Cir. 1986).

In this case, the Court not only instructed the jury that the United States was required to prove one of the affirmative acts occurred after September 16, 2014, the Court also specified which affirmative acts may have occurred after September 16, 2014, to limit confusion.  The Court read the entire statute-of-limitations instruction to the jury twice.  The defense counsel also read the entire statute-of-limitations instruction to the jury.  Counsel for the United States discussed the statute-of-limitations instruction in closing argument, cited the cutoff date, and gave specific examples of evidence that had been presented that occurred after the cutoff date.

The specificity of the statute-of-limitations instruction and the way it was emphasized to the jury left no room for confusion.  No substantial legal error occurred with respect to the affirmative acts that occurred before the statute of limitations date.

**WHEREFORE**, this Court should deny defendant's motion.

Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney

*s/ Amanda E. Gregory*
Amanda E. Gregory
Assistant United States Attorney
717 W. Broadway
Louisville, Kentucky 40202

## CERTIFICATE OF SERVICE

I hereby certify on July 26, 2022, I electronically filed this document through the CM/ECF filing system, which will serve opposing counsel via electronic mail.

*s/ Amanda E. Gregory*
Amanda E. Gregory