UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA     PLAINTIFF

v.     CASE NO. 3:20-CR-86-BJB
*Electronically filed*

KEITH HUNTER     DEFENDANT

### RESPONSE TO DEFENDANT'S MOTION FOR A NEW TRIAL

The defendant has moved the Court for a new trial based on "newly discovered evidence" pursuant to Federal Rule of Criminal Procedure 33. DN 157 (Motion for New Trial). The Court should deny the motion as the evidence was available before trial and is neither material nor likely to result in an acquittal.

### FACTUAL BACKGROUND

Since the mid-1990's, the defendant failed to file timely tax returns and failed to pay tax that was due, even when he had the funds available to make the payments. Based on information the Internal Revenue Service obtained from the defendant's filed tax returns, the defendant had outstanding tax liability for 2000, 2001, 2002, 2006, 2008, and 2011. The defendant never made voluntary payments on these outstanding balances or otherwise paid them off.

In 2011, the defendant, a practicing lawyer, received approximately $1.4 million in payment for legal services that would have been more than sufficient to pay off all his outstanding tax debt. Between 2013 and 2019, the defendant received over $250,000 in distributions from Hunter Hills LLC, a real estate development company in which he had a 50% interest. Rather

1

than using these funds to pay off his tax debt, the defendant took steps to hide his assets so they could not be seized by the Internal Revenue Service.

The defendant purchased his home through a nominee and had a friend open a nominee bank account. In 2011, the defendant made a $300,000 donation to Through the Valley Foundation, Inc., his friend Wayne Gallavin's non-profit. DN 83 (Trial Tr.) at 60-64. Funds from the donation were then used by Through the Valley Foundation, Inc. to purchase the defendant's former home out of foreclosure. *Id*. The defendant then lived in the home from 2012 up until he was arrested in this matter. DN 89 (Trial Tr.) at 75-76. In 2014, the defendant endorsed a check from a distribution from Hunter Hills LLC, and provided it to his friend, Wayne Gallavin. *Id*. at 85-92. Wayne Gallavin opened a bank account at River City Bank under Wayne Gallavin's business, but designated the account as the defendant's account. *Id.* The account was then used primarily for the benefit of the defendant. *Id*.

The use of nominees to hold assets makes it more difficult for the Internal Revenue Service to identify and seize assets as part of the civil collection process. As the Internal Revenue Service made efforts to collect on the defendant's outstanding liability through civil processes, the defendant intentionally provided false and misleading information on multiple occasions during these proceedings.

The defendant also stored personal funds in an account identified as an attorney escrow account. An attorney escrow account is a bank account that is opened and maintained by an attorney, and which is dedicated solely to money received from and intended for clients. The Internal Revenue Service would generally not seize funds in an attorney escrow account to pay off an attorney's tax debt, under the assumption the funds belong to the attorney's clients.

On January 7, 2011, the same day the defendant received over $1 million in legal fees, the defendant opened an account at PNC Bank that was labeled, "ATTY AT LAW, ESCROW ACCOUNT" ("PNC 0147 account"). *See* DN 149-2 (Trial Ex. 19H - PNC Bank records) at 88. After opening the account labeled as an attorney escrow account, the defendant deposited income into the account and used the account to store his personal assets and pay for his personal expenses. *See* DN 148-1 (Trial Ex. 19H - PNC Bank records); DN 148-1 (Trial Ex. 19H - PNC Bank records); 149 (Trial Ex. 19H - PNC Bank records); 149-1 (Trial Ex. 19H - PNC Bank records); 149-2 (Trial Ex. 19H - PNC Bank records).

From January 2011 until at least 2019, the defendant also engaged in a process of operating in cashier's checks known as recycling cashier's checks. The defendant purchased a cashier's check, then later cashed out a small portion of the initial cashier's check, while using the remainder to purchase additional cashier's checks. By keeping assets in cashier's checks, rather than in a bank account, the defendant made it more difficult for the Internal Revenue Service to locate and seize the funds.

## **PROCEDURAL BACKGROUND**

On September 16, 2020, a federal grand jury returned an indictment charging the defendant with one count of evasion of payment of tax, in violation of Title 18, United States Code, Section 7201. DN 1 (Indictment). The indictment alleged the defendant hid assets by "storing personal income in a client escrow account," using a "nominee bank account," "purchasing his home through a nominee," "recycling cashier's checks," and "providing false and misleading information regarding his assets and income" to the Internal Revenue Service. DN 1 at 1-2. On September 22, 2021, a federal grand jury returned a superseding indictment, charging the

defendant with the same crime, but clarifying that bonds were also used in the pattern of recycling cashier's checks. DN 27 (Superseding Indictment). At the conclusion of the trial in the matter, the jury returned a verdict of guilty on the sole count of tax evasion. DN 77 (Jury Verdict).

Hunter filed an appeal which is still pending. *See United States v. Hunter*, Case No. 22-5992 (6th Cir.). Nonetheless, on February 7, 2024, Hunter filed a motion for a new trial based on "newly discovered evidence." DN 157 (Motion for New Trial). Hunter argues that two categories of "newly discovered evidence" justify a new trial: (1) a Kentucky Bar Association trial subpoena response consisting of records Hunter filled out online and (2) an alleged "agreement" between the United States and Wayne Gallavin and/or Gallavin's nonprofit. *See id.*

## ARGUMENT

### I. The Court May Consider the Defendant's Motion, But May Not Grant It While the Appeal Is Pending.

As an appeal is pending in this matter, the Court may not grant the defendant's motion based on the plain language of the federal rules and Sixth Circuit precedent. Under Rule 33 of the Federal Rules of Criminal Procedure, "If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case." F.R.Cr.P. 33(b)(1). However, the Sixth Circuit allows district judges three other options in ruling on a motion for a new trial while an appeal is pending: (1) if the Court is satisfied it would not grant the motion, the Court may deny the motion outright; (2) the Court may "decline to rule with finality on the matter until the appeal is concluded"; or (3) if the Court thinks it is likely the motion would be granted, the Court may certify this to the appellate court, which gives the court of appeals the option of remand. *United States v. Blanton*, 697 F.2d 146, 148 (6th Cir. 1982); *see also United States v. Redd*, 29 Fed.Appx.

290, 303, 2002 WL 193928, at *9 (6th Cir. 2002). In this case, the United States urges the Court to deny the motion outright for the reasons explained below.

    II.    **Hunter's Motion for a New Trial Should Be Denied on the Merits**

In order to win a motion for a new trial based on newly discovered evidence, the defendant must prove: "(1) the new evidence was discovered after the trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993) (*quoting United States v. O'Dell*, 805 F.2d 637 (6th Cir. 1986)). Hunter cannot meet this burden on either of the claims he raises in his motion.

    A.    **Hunter Is Not Entitled to a New Trial Based on the Kentucky Bar Association Subpoena Response, Which Was Provided to Him in Discovery and Available to Him Before it Was Available to the United States, and Was Immaterial to the Charge of Which Hunter Was Convicted.**

Hunter cannot prove evidence of the fact he reported to the Kentucky Bar Association he did not have an IOLTA account was discovered after trial and/or could not have been discovered earlier with due diligence. Hunter claims the United States did not produce the trial subpoena response from the Kentucky Bar Association before trial. This is not true. The Kentucky Bar Association response was produced in discovery at USA-38728 through USA-38290. *See* Exhibit 1 (Subpoena Production). On May 26, 2022, counsel for the United States provided the initial production by USAfx, a file-sharing service, and sent a letter to Hunter's counsel by email identifying the Kentucky Bar Association subpoena response as one of the documents in the production. *See* Exhibit 2 (USAfx file sharing email); Exhibit 3 (May 26, 2022 Email and Discovery Letter).

5

Even if the United States had not produced the subpoena response, the records at issue were available to Hunter. The documents produced by the Kentucky Bar Association are Hunter's Kentucky Bar Association records that Hunter filled out electronically and submitted, that then became part of his records of bar membership. *See* DN 157-4 (Kentucky Bar Association records attached to Motion for New Trial) at 1-9. Hunter would have been aware of the contents of the forms and their existence, because he was the one who filled them out. Hunter could have accessed them by requesting them from the Kentucky Bar Association himself. Further, it appears the materials were provided to Hunter by the Kentucky Bar Association prior to trial. Based on Hunter's filing, the response that was later provided to the United States' in response to the trial subpoena was first attached to a filing in *Kentucky Bar Association v. Keith Hunter*, and the filing and the attachments were served on Hunter on April 13, 2022. *See* DN 157-1 (Affidavit attached to Motion for New Trial) at 1-3.

Moreover, the Kentucky Bar Association subpoena response is not material and would not have resulted in an acquittal at trial. The information contained in the records is Hunter's self-reporting that he does not have an IOLTA account and that he is exempt from the requirement to maintain an IOLTA account. *See* DN 157-4 (Kentucky Bar Association records attached to Motion for New Trial) at 1-9. Hunter himself testified he did not have an IOLTA account. DN 84 (Trial Transcript) at 39. Moreover, the United States never tried to prove Hunter had an IOLTA account. Whether Hunter had an IOLTA account was completely irrelevant to the case. Hunter was not charged with anything related to an IOLTA account. Hunter was charged with evading payment of his tax liability by labeling the PNC 0147 account to make it appear to be an account used to store client funds, then using the PNC 0147 account to store personal funds.

Hunter's argument is based on the faulty assumption that IOLTA accounts are the only type of escrow accounts in which attorneys hold client funds. Kentucky rules require that an IOLTA account must be established to hold "clients' funds which are nominal in amount or to be held for a short period of time so that they could not earn interest income for the client in excess of the costs incurred to secure such income." Ky. SCR 3.830. Further, the rules provide "[n]o funds may be deposited in any IOLTA account when either the amount or the period of time that the funds are held would earn for the client interest above the costs that would otherwise be incurred to generate such interest." Ky. SCR 3.830(1). Thus, the rules assume IOLTA accounts are not the only type of escrow account used by attorneys to store client funds. Rather, they are a specific type of escrow account to store client funds in nominal amounts or client funds that will only be held for a short period.

Black's Law Dictionary defines an "escrow account" as "[a] bank account, generally held in the name of the depositor and an escrow agent, that is returnable to the depositor or paid to a third person on the fulfillment of specified conditions." ACCOUNT, Black's Law Dictionary (11th ed. 2019). A "client escrow account" is an account where any fiduciary holds money for clients. An "attorney escrow account" is a subset of the broader category "client escrow account." An "IOLTA account" is a is a subset of the broader category "attorney escrow account." An "IOLTA account" is not the only type of "attorney escrow account" or "client escrow account."

Hunter's argument also erroneously assumes that because a rule exists, everyone complies with it. Attorneys can store funds -- even nominal amounts or funds held for a short period -– in

7

bank accounts in violation of Kentucky Supreme Court Rules. They would just be subject to disciplinary action.

Finally, Hunter's claim that the PNC 0147 account was actually a "business escrow" account for his law practice makes no sense. A law practice's escrow account, like any attorney escrow account, would presumably hold client funds. The PNC 0147 account was primarily used for Hunter's personal expenses. DN 83 (Trial Tr.) at 98-105. Under Hunter's theory regarding the account's purpose, what is being escrowed? And for whom? Hunter testified that he occasionally used the account for funds he received from a client for payment of filing fees and other expenses. If that is true, then Hunter was putting client's funds into the account, they just weren't funds that were supposed to be returned to a client. Clients who had the money they had paid for a filing fee seized by the IRS would suffer hardship just the same as clients who had their settlement funds seized by the IRS. Moreover, if Hunter labeled the account "ATTY AT LAW, ESCROW ACCOUNT" because he was going to put client's filing fees into the account, there is still no explanation as to why he stored his personal funds in the account and used the account to pay for travel expenses and new suits.

    **C.    Hunter Is Not Entitled to a New Trial Based on Gallavin's Subsequent Decision to Evict Hunter from 1420 South Fourth Street.**

Hunter claims he discovered after trial that "Gallavin and TTV were promised a huge windfall for his testimony before the grand jury and at trial." DN 157 (Motion for New Trial) at 5. This claim is confusing for many reasons, the foremost of which is that Gallavin did not testify in grand jury or at trial. Further, it is unclear how Gallavin and his nonprofit could be promised a windfall from the United States when the windfall at issue had already been provided by Hunter. At any rate, there was no such agreement between the United States and Gallavin.

Gallavin has consistently taken then position the 1420 South Fourth Street transaction was legitimate and the United States' prosecution team has consistently taken the position it has no position on any unwinding of the transaction. Hunter cannot prove this information is newly discovered or not previously available through due diligence. The actions Gallavin took in evicting Hunter are consistent with Gallavin's claims the transaction regarding 1420 South Fourth Street was not a sham. *See generally* Exhibit 4 (Wayne Gallavin Memoranda of Interviews). The United States disclosed Gallavin's statements to Hunter in discovery, and as such they were discovered before trial and available through due diligence. *See id.* Moreover, while the United States determined Gallavin's testimony was not necessary to prove the charge against Hunter, counsel for the United States asked Gallavin to be available and at the courthouse in case the defense wanted to call Gallavin as a witness. DN 89 (Trial Tr.) at 121.

Once Hunter's case was referred for criminal prosecution, collection efforts ceased. *See* DN 89 (Trial Tr.) at 54-55. As such, during the course of the criminal investigation, when Hunter's criminal defense counsel offered to "unwind" the transaction involving 1420 South Fourth Street, counsel for the United States explained the United States took "no position on what [Hunter did] with the house." *See* Exhibit 5 (January 28, 2020 email) at 1. Similarly, during an interview with the IRS as part of the criminal investigation, Gallavin stated he could sell the house and give the money to the IRS, IRS Special Agent Jay Taylor told Gallavin that it was the past the time when that was an option. *See* Exhibit 4 (Wayne Gallavin Memoranda of Interviews) at 4. This has consistently been the United States' position with respect to 1420 South Fourth Street once the matter was referred for criminal investigation. The United States was not a party to the transaction involving the house and would not have been involved in any unwinding. The United

9

States' agreement or participation was not necessary to unwind the transaction, if that is what the parties wanted to do, nor was the United States' agreement required for Gallavin to sell the property and leave Hunter out in the cold, if that is what he wanted to do. As Janice Theriot pointed out at trial, this was a risk inherent in the sham charity transaction Hunter encouraged her to participate in: "[A]ny promise you make to someone before you sign that deed disappears when you sign that deed, and once I give my house to his friend, he could evict me, he could sell the house and not give me the money, I would lose all control . . . ." DN 81 (Trial Tr.) at 14.

As Gallavin was not a witness at trial, any evidence regarding an alleged agreement with him is not material nor likely to have resulted in an acquittal. Such an agreement would only be used in impeaching Gallavin. Hunter's argument is confusing, so it is possible he is arguing that Gallavin's post-trial action of evicting Hunter is consistent with Hunter's trial claim that his $300,000 donation for the purchase of his house was a genuine charitable donation. This might be a legitimate argument if this had happened a few months after of the transaction. However, Gallavin evicted Hunter over ten years after the transaction, after Gallavin had been interviewed multiple times by law enforcement agents, and Hunter had been convicted at trial. Moreover, due to the timing of the transaction, the sham transaction was not one of the affirmative acts of evasion within the statute of limitations. Rather, the sham transaction was one small part of overwhelming evidence concerning the defendant's willfulness. As such, evidence related to Gallavin's post-trial actions is not material and would not have resulted in the defendant's acquittal.

      **WHEREFORE**, this Court should deny defendant's motion.

Respectfully submitted,

MICHAEL A. BENNETT
United States Attorney

*s/ Amanda E. Gregory*
Amanda E. Gregory
Assistant United States Attorney
717 W. Broadway
Louisville, Kentucky 40202

## CERTIFICATE OF SERVICE

I hereby certify on February 11, 2024, I electronically filed this document through the CM/ECF filing system.  On February 12, 2024, I caused a copy to be mailed to the defendant.

*s/ Amanda E. Gregory*
Amanda E. Gregory